UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| MERCEDES KURTIS,<br><br>Plaintiff,<br><br>v.<br><br>EQUIFAX INFORMATION SERVICES LLC, et al.,<br><br>Defendants. | Case No. 4:26-CV-47-GSL-JEM |

**OPINION AND ORDER**

This matter is before the Court on two motions. The first is Plaintiff Mercedes Kurtis' Third Motion to Remand to State Court, filed on June 26, 2026. [DE 7]. That motion is fully briefed and ripe for judgment. [*See* DE 8; DE 10–11]. The second motion before the Court is Defendant Equifax Information Services LLC's ("Equifax") Motion to Strike Errata Sheet of Evan Hendricks, filed on June 23, 2026. [DE 5].[1] For the reasons stated below, the Court **GRANTS** Defendant's Motion to Strike [DE 5] and **DENIES** Plaintiff's Motion to Remand [DE 7].

**BACKGROUND**

This case involves a complex procedural history concerning multiple rounds of removal and remand between the Tippecanoe Circuit Court and the Northern District of Indiana. A synopsis of the relevant background is detailed accordingly.[2]

---

[1] Although Plaintiff did not file a formal response to Equifax's Motion to Strike, Plaintiff addressed it in the Motion to Remand. [*See* DE 8 at 13].

[2] As noted above, the inherent nature of proceeding through multiple removals and remands has resulted in a series of interrelated cause numbers from both the Tippecanoe Circuit Court and the Northern District of Indiana. Plaintiff's Third Motion to Remand refers to and incorporates filings from each of these causes, including some state court documents. [*See* DE 12 (ordering remaining state court documents into this docket)]. For purposes of

On May 18, 2023, Plaintiff commenced a suit against Defendant Student Collections, LLC[3] in the Tippecanoe Circuit Court under Cause No. 79C01-2305-CT-98, bringing a credit dispute claim under the Fair Credit Reporting Act (FCRA) (codified at 15 U.S.C. §§ 1681–1681x). [*See* DE 1-4 at 4]. Plaintiff thereafter filed an amended complaint on July 7, 2023, adding Equifax as a defendant and asserting claims against it under §§ 1681i and e(b) of the FCRA. [*Id.*]. Both claims arose out of Equifax's alleged mishandling of the "Student Collections" tradeline in Plaintiff's credit account, wherein Equifax purportedly continued to report a collection account despite Plaintiff's disputes and a prior court order showing that no such debt was owed. [DE 8 at 4; *see also* Cause No. 4:23-cv-66, DE 4].

**I. <u>First Removal and Remand</u>**

On July 31, 2023, Equifax removed the case to the Northern District of Indiana, which proceeded under Cause No. 4:23-cv-66. [DE 1 at 1; DE 8 at 4]. During this first federal action, Equifax represented that it had not sold or otherwise disclosed Plaintiff's credit report to a third party. [DE 8 at 4]. Based on this representation, as well as evidence developed through Equifax's Rule 30(b)(6) deposition, Plaintiff moved to amend her complaint on April 17, 2024, to drop her § 1681e(b) claim for third-party dissemination of the credit report. [*Id.*; *see* Cause No. 4:23-cv-66, DE 34]. Furthermore, based on this amendment, Plaintiff also filed her first motion to remand on the ground that she lacked a "concrete injury" sufficient to confer Article III standing. [DE 1 at 2]. To support the motion to remand, Plaintiff stated that "she has searched for a basis

consistency, documents under this cause number (Cause No. 4:26-cv-47) will be cited as [DE X]. Citations to documents from other causes, where needed, will be cited as [Cause No. Y, DE X].

[3] Defendant Student Collections, LLC has not filed an appearance of counsel in this cause and does not appear to have otherwise participated in these proceedings.

for Article III jurisdiction against Equifax to no avail," and that her only claimed damages were for "emotional distress." [*Id.* (quoting Cause No. 4:23-cv-66, DE 34)].

The court granted Plaintiff's motion for leave to amend the complaint on June 26, 2024, and Plaintiff filed her amended complaint two days later. [*Id.* (citing Cause No. 4:23-cv-66, DE 45–46)]. The court then granted Plaintiff's motion to remand on July 18, 2024, explaining that Plaintiff "no longer ha[d] Article III standing to have the claims in her Second Amended Complaint heard in federal court because her only alleged damages [were] emotional damages from stress, which the Seventh Circuit Court of Appeals has held is not a concrete injury in fact for purposes of standing." [*Id.* (quoting Cause No. 4:23-cv-66, DE 50)].

## II. <u>Second Removal and Remand</u>

The parties continued litigating the claims in state court, proceeding through discovery and briefing on a motion for summary judgment. [DE 8 at 5]. As part of the summary judgment briefing, on January 9, 2025, Plaintiff served Equifax with her response brief, which Equifax claimed put it on notice that Plaintiff intended to seek damages beyond mere "emotional distress," thereby constituting a concrete injury in fact for purposes of Article III standing. [DE 1 at 2]. Soon afterward, on February 4, 2025, Equifax removed the case once more to this Court, proceeding under Cause No. 4:25-cv-8. [*Id.* at 3].

Relying on Plaintiff's response brief arguments to summary judgment, Equifax relayed the following contentions as support for removal, including: (1) Plaintiff's belief that she was entitled to compensation under the FCRA for her emotional distress; (2) Plaintiff's belief that she was embarrassed because of the negative credit reporting hanging over her head; (3) Plaintiff's assertion that she wasted time and resources disputing with Equifax; (4) Plaintiff's assertion that she was distanced from her fiancé, and therefore had to travel to spend time with him; (5)

Plaintiff's assertion that she and her fiancé were planning to move in together, but decided not to move forward with an application for an apartment; (6) Plaintiff's statement that she was stuck in a housing contract with Indiana University-Purdue University Indianapolis; (7) Plaintiff's sister's testimony that Plaintiff's "demeanor changed" and that while Plaintiff "is usually outgoing, talkative and silly, [her sister] saw that shift to her being more quiet and to herself, put away and frustrated"; (8) Plaintiff's brother's testimony that he "observed" her stress as she was cut off from the family, that she "wasn't . . . her normal self," that she did not talk as much, and that this change was due to Equifax; (9) Plaintiff's mother's testimony that Plaintiff would physically refrain from being with the family due to her stress; and (10) Plaintiff's indication of silence and the making of a facial "expression" when she was unsuccessful in disputing her credit report. [DE 10-6 at 5–6].

On March 6, 2025, Plaintiff moved to remand for a second time. [DE 7-2; Cause No. 4:25-cv-8, DE 18]. In support she explained that Equifax's removal was untimely under 28 U.S.C. § 1446(b)(3) because Equifax had long known of the alleged facts that it was relying on for removal through Plaintiff's dispute letters and correspondence (postage and call recordings) with Equifax, [*see* DE 8 at 6], as well as through previous document production and filings in the state court proceedings, [*see* Cause No. 4:25-cv-8, DE 28 at 4–9 (arguing facts for removal were ascertainable through Equifax's own document production to Plaintiff, Equifax's call recordings, Plaintiff's deposition transcript, Plaintiff's motion for summary judgment, and deposition transcripts of Plaintiff's family and fiancé)]. Plaintiff also argued that some of the facts Equifax relied on, such as time Plaintiff spent traveling to visit her fiancé and being stuck in an unfavorable housing situation, were not suitable grounds for standing because they were not fairly traceable to Equifax's conduct. [Cause No. 4:25-cv-8, DE 28 at 11].

On July 16, 2025, the Court held a hearing on the motion to remand. [Cause No. 4:25-cv-8, DE 34]. There, Plaintiff asserted that the mentioning of any facts that Equifax perceived to be physical manifestations or other monetary harms argued in the summary judgment response were purely for purposes of contextualizing the emotional distress—to "state her experience." [*See* Cause No. 4:25-cv-8, DE 36 at 15:4–13]. Further, Plaintiff reiterated that, notwithstanding the lack of concreteness, Equifax was well aware of these facts more than thirty days prior to removing the case the second time, and thus could not rely on them now. [*Id.* at 18]. On July 18, 2025, this Court remanded the case back to the Tippecanoe Circuit Court for the second time. [Cause No. 4:25-cv-8, DE 35]. In that order, the Court found that the "injuries" or physical manifestations identified by Equifax only provided context to Plaintiff's alleged emotional distress, and did not themselves meet the threshold of concrete injuries in fact.[4] [*Id.* at 3]. The Court further found that Plaintiff had not, to that point, sought damages beyond those related to emotional distress. [*Id.* at 4].

On July 25, 2025, Equifax moved to reconsider the Court's decision to remand, arguing that the Court failed to address the tangible, monetary harms discussed in the state court briefing, primarily the wasted time and money spent disputing the credit report and damages related to being stuck in an unfavorable housing contract. [Cause No. 4:25-cv-8, DE 37 at 2]. Equifax further highlighted a statement from Plaintiff's reply brief to the motion to remand, which expressed that Plaintiff "never made a statement that she was not seeking tangible, monetary

[4] The Court, in explaining the Seventh Circuit's precedent that emotional distress alone is not a concrete injury for purposes of standing, acknowledged that some district courts within the circuit recognize physical manifestations of emotional distress as a concrete injury. [Cause No. 4:25-cv-8, DE 35 at 3]. *See Gilbert v. TrueAccord Corp.*, 608 F. Supp. 3d 656, 664 (N.D. Ill. 2022); *Mladenov v. R1 RCM, Inc.*, 2022 WL 5116450, at *3 (N.D. Ill. Oct. 4, 2022); *Billups v. I.C. Sys., Inc.*, 2022 WL 3684572, at *5 (N.D. Ill. Aug. 25, 2022). The Court did not take a firm position on whether the same is recognized in this district, stating only that "[e]ven if the Court accepted the position of its sister courts in Illinois, Plaintiff's 'new injuries' do not meet the threshold of concrete injuries." [Cause No. 4:25-cv-8, DE 35 at 3].

harms. Plaintiff did, however, argue in her briefing that the crux of her harms includes emotional distress." [*Id.* at 1 (quoting Cause No. 4:25-cv-8, DE 28 at 11)]. The Court denied the motion, finding that while Equifax is correct that tangible, monetary harms can confer a concrete injury to establish standing, Plaintiff expressly disavowed seeking such damages at the motion hearing on July 16, 2025. [Cause No. 4:25-cv-8, DE 38 at 1 (citing Cause No. 4:25-cv-8, DE 36 at 29:12–14)].

### III. <u>Third Removal and Current Proceedings</u>

Once the matter was removed back to state court, the parties resumed summary judgment briefing and preparations for trial. [DE 1 at 3]. Then, on May 21, 2026, two developments catalyzed Equifax's third, and current, removal to federal court. [*See* DE 1].

First, Equifax deposed one of Plaintiff's experts, Evan Hendricks, who was retained to testify about the credit reporting industry and damages related to Plaintiff's credit dispute. [DE 5-1 at 8:15–21, 35:20–36:19]. As part of the discussion on Plaintiff's incurred harms, Mr. Hendricks testified that Plaintiff suffered from direct physical symptoms as a result of the emotional distress. That dialogue, in pertinent part, is as follows:

> Q: Do you know whether Plaintiff was denied credit as a result of the reporting at issue in this case?
>
> A: I don't. No, I don't recall that.
>
> Q: Do you know if whether Plaintiff – do you know whether Plaintiff has suffered any financial harm as a result of the reporting in this case?
>
> A: I guess it just depends on how you define financial harm, but in my opinion, if someone like the Plaintiff knows that she's got inaccurate derogatory information on her credit, then she was chilled from applying for credit because she knows it would be a futile exercise. She would not get credit or would not get it on the terms to which she was otherwise entitled, and to me that's a form of financial harm.

Q: Are you going to testify at trial that the Plaintiff – your expert opinion is that Plaintiff has suffered from financial harm?

MR. KELLER: Objection, form.

THE WITNESS: Just to the – if I'm asked just as you asked me here, I will give that answer that, yes, that's a form of financial harm and she experienced that per the facts in this case.

Q: Do you have any opinion as to what credit Plaintiff was chilled from applying for?

A: I can't remember the details but I think like for an apartment at some point she was chilled from applying for an apartment because she feared that this inaccurate derogatory data would lead to an unsatisfactory result.

Q: Do you know about when that was?

A: I don't remember the – I don't remember those dates, no.

Q: Do you know whether any third-party relied on her consumer report while the StuCo tradeline was reporting?

A: Not sure about that. I do remember seeing there's an inquiry from Capital One.

Q: Do you know if Plaintiff applied for credit with Capital One?

A: No, I don't recall if that was the case or not. I would have to go back and look at the inquiry or any documents relating to it.

Q: Are you going to testify regarding any out-of-pocket damages Plaintiff incurred as a result of the reporting at issue?

MR. KELLER: Form.

THE WITNESS: Yeah, I don't know whether or not I will. My recollection is that she had to pay for the postal expenses to send in her disputes, so I think that's an out-of-pocket expense. So, if I'm asked that I would say that and that's typical for people who are trying to dispute inaccuracies on their credit report.

BY MS. SHARP:

Q: Are you going to offer testimony regarding Plaintiff's emotional distress relating to the credit reporting?

MR. KELLER: Form.

THE WITNESS: Well, not as such. I mean, the emotional distress to actually -- someone has to diagnose whether she had emotional distress. If I'm asked, I think I would point out that Plaintiff has testified that it was emotionally distressful for her but she will have already testified – or she will already testify to that. But I referenced earlier typical problems experienced by victims of credit report inaccuracy, and one of those categories is – well, I think there's eight categories and the last category is the emotional distress that's stemming from the previous seven categories, so it's typical that the problem is that consumers who are made victims of credit report inaccuracy all complain or almost all complain that they experience emotional distress.

BY MS. SHARP:

Q: Can you describe what that emotional distress is?

A: Well, it just depends on what the – what the individual consumer says it is.

Q: Are you going to offer expert testimony at trial regarding any physical symptoms that Plaintiff suffered from as a result of any emotional distress?

MR. KELLER: Objection, form.

THE WITNESS: Only to the extent that she said she had physical symptoms.

BY MS. SHARP:

Q; Do you recall if she said she had any physical symptoms?

A: Yes, she said that she would feel it in her chest and that her hands would shake when these things came up, the problem of not getting something fixed when she expected it to get corrected.

Q: When did she say that?

A: Yesterday.

[*Id.* at 38:7–42:3].

The second basis for removal arises from a supplemental brief addressing standing that was filed in state court. [*See* DE 1-3]. At several points in the brief, Plaintiff explained that she has proper standing under Indiana law and that, in listing the bases for standing, "Equifax's reporting caused [Plaintiff] embarrassment, fear, emotional distress, frustration, wasted time and effort, strain on personal relationships, altered conduct, and hesitation to pursue housing opportunities with her fiancé." [*Id.* at 3]. Plaintiff, however, further argued that "even federal courts applying the more restrictive Article III standing framework routinely recognize standing based on harms materially similar to those suffered by [Plaintiff]." [*Id.* at 12–13 (collecting cases)]. In particular, Plaintiff noted the following:

> Federal courts likewise recognize that repeated efforts to correct inaccurate reporting—including postage costs, time expenditure, and repeated disputes—constitute concrete injury. In *Mack v. Resurgent Capital Services, L.P.*, the Seventh Circuit held that a consumer suffered concrete injury where confusing debt communications caused her to send a *second* validation request, expend *additional* time and effort, and incur more postage costs. 70 F.4th 395, 401-02 (7th Cir. 2023). The Seventh Circuit specifically recognized that "the time and effort [the consumer] spent reasserting her statutory right" and "money she spent" responding to the reporting constituted concrete injury sufficient for Article III standing. *Id.* at 404. Here, [Plaintiff] likewise repeatedly expended time, effort, and money after her first dispute in attempting to correct Equifax's continued post-judgment reporting despite repeatedly providing documentation establishing she owed nothing. Had Equifax corrected its reporting the first time around, [Plaintiff] would not have had to expend additional time, effort, or resources.

[*Id.* at 13–14 (original alteration and internal record citations omitted; emphases in original)].

On June 13, 2025, three weeks after the case was removed to this Court, Plaintiff provided Equifax with an errata sheet from the Hendricks deposition. [DE 5 at 3]. In answering the question of whether Mr. Hendricks recalled hearing Plaintiff discuss any physical symptoms, the errata sheet stated the following:

> **Original Answer:**
>
> A: "Yes, she said that she would feel it in her chest and that her hands would shake when these things came up, the problem of not getting something fixed when she expected it to be corrected."
>
> **Corrected and Clarifying Answer:**
>
> My testimony was not intended to attribute physical symptoms to Equifax's conduct or the reporting of the Student Collections account. [Plaintiff] never indicated that. Nor was she asked to do so during our discussion.
> My testimony concerning physical symptoms was responding to a general question concerning whether physical symptoms had been discussed generally and was not intended as an opinion that Equifax's conduct caused physical symptoms. Defense counsel did not ask whether any physical symptoms were caused by Equifax's conduct, the reporting of the Student Collections account, or any post-judgment reinvestigation activity. To the extent I was attempting to recall a discussion involving physical symptoms, I believe I was recalling [Plaintiff's] discussion concerning the apartment maintenance and habitability issues that preceded her move from the apartment. During our discussion, [Plaintiff] described repeatedly attempting to have serious maintenance issues addressed by the apartment complex and the frustration associated with those efforts. My review of her disputes also reflects that maintenance requests were made to the landlord which were never completed.
> I was not offering an opinion that Equifax's conduct caused physical symptoms. [Plaintiff] never said that.
>
> Reason for Change:
> Clarification of testimony and context of answer following review of transcript.

[DE 5-2 at 2–3]. Equifax is now moving to strike the errata sheet. [DE 5]. Plaintiff did not file a formal response to Equifax's request and the time to do so has passed.

Finally, on June 26, 2026, Plaintiff filed her third motion to remand the case back to state court. [DE 7]. That motion is fully briefed and ripe for ruling.

## LEGAL STANDARD

Article III of the U.S. Constitution limits the jurisdiction of federal courts. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). The power of federal courts is confined to "Cases" and "Controversies." *Id.* at 423. "For there to be a case or controversy under Article III,

the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 820 (1997)). And, for there to be standing, the plaintiff must demonstrate "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only the rights of individuals, and that federal courts exercise their proper function in a limited and separated government[.]" *Id.* (internal quotation marks and citations omitted).

When a case is removed from state court to federal court, the burden "to establish all elements of jurisdiction—including Article III standing . . ." is placed upon the removing defendant. *Collier v. SP Plus Corp.*, 889 F.3d 894, 896 (7th Cir. 2018). But "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c); *see Collier*, 889 F.3d at 897. "Courts should interpret the removal statute narrowly and presume that the plaintiff may choose his or her forum." *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 911 (7th Cir. 1993).

## **DISCUSSION**

### **I. Motion to Strike Errata Sheet [DE 5]**

Before addressing Plaintiff's motion to remand, the Court must first decide Equifax's motion to strike errata sheet, as the Court's decision will impact whether the Hendricks deposition provides a suitable ground for remand. To recap, Plaintiff's expert was questioned as to what damages and harms Plaintiff incurred as a result of Equifax's conduct. Mr. Hendricks testified that he had spoken with Plaintiff the day before the deposition about the fact that "it was

a very frustrating and stressful experience where she continued disputing and Equifax continued to refuse to correct the inaccurate information that Equifax was reporting on her credit and how it was just a major negative in her life." [DE 5 at 2 (quoting DE 5-1 at 11:9–14)]. In addition to testifying about various other forms of harm that Plaintiff suffered, including financial harm from a chilled apartment application, out-of-pocket expenses, and emotional distress, Mr. Hendricks also stated that he intended to testify to the physical symptoms Plaintiff suffered, including that "she would feel it in her chest and that her hands would shake when these things came up, the problem of not getting something fixed when she expected it to get corrected." [DE 5-1 at 41:23–42:1].

Three weeks following Mr. Hendricks' deposition and Equifax's subsequent removal, Mr. Hendricks submitted an errata sheet stating that he wished to clarify the context of the statements above. [De 5-2 at 2]. He explained that "[his] testimony was not intended to attribute physical symptoms to Equifax's conduct or the reporting of the Student Collections account. [Plaintiff] never indicated that. Nor was she asked to do so during [their] discussion." *Id.* Rather, "[h]is testimony concerning physical symptoms was responding to a general question concerning whether physical symptoms had been discussed generally and was not intended as an opinion that Equifax's conduct caused physical symptoms." [*Id.* at 2–3]. Equifax has now moved to strike the errata sheet, arguing that it "improperly attempts to materially change and misconstrue Mr. Hendricks' sworn deposition testimony." [DE 5 at 3].

Federal Rule of Civil Procedure 30(e) permits a deponent to review a transcript of the deposition and, "if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1)(A)–(B). In interpreting the "changes in form or substance" language under Rule 30(e), the Seventh Circuit has held that a deponent

changing a deposition transcript from what he said to what he meant, although questionable, is nonetheless permissible. *See Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000). While the court permits substantive changes to the deposition transcript, it has also held through analogy to the so-called "sham affidavit" rule that "a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" *Id.* (collecting cases); *accord Truly v. Sheahan*, 135 F. App'x 869, 871 (7th Cir. 2005) (stating that a litigant may not rewrite deposition testimony with subsequent affidavits or errata sheets to manufacture issues of fact and defeat summary judgment where the correction cannot plausibly be interpreted as a correction to the transcript).[5] Only a narrow set of circumstances permit a departure from this rule, such as where the change is submitted to clarify ambiguous language or confusing testimony, or when the subsequent testimony is based on newly discovered evidence. *See Cowan v. Prudential Ins. Co. of Am.*, 141 F.3d 751, 756 (7th Cir. 1998) (considering subsequent affidavit testimony because the deposition questions were confusing); *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1004–07 (7th Cir. 1999) (considering contradicting affidavit testimony because the deposition was open to more than one meaning); *James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020)

[5] Because of the limited Seventh Circuit caselaw interpreting Rule 30(e) post-*Thorn*, it is unclear whether the prohibition on contradictory substantive changes applies throughout the entirety of the litigation or only at the summary judgment stage. Some decisions within the Southern District of Indiana and Northern District of Illinois have found the rule narrowly applicable to summary judgment because of the procedural posture of the cases cited in *Thorn* to support the prohibition, as well as the *Thorn* court's analogy to the "sham affidavit" rule, a rule that prohibits the creation of material disputes of fact through subsequent contradicting affidavits. *See United States ex rel. Robinson v. Ind. Univ. Health Inc.*, 204 F. Supp. 3d 1040, 1042–43 (S.D. Ind. 2016); *Arce v. Chi. Transit Auth.*, 311 F.R.D. 504, 511 (N.D. Ill. 2015). The Northern District of Indiana, however, has routinely applied the rule broadly and barred subsequent contradictory testimony from consideration accordingly, regardless of whether the case was procedurally in discovery or at summary judgment proper. *See Monroe v. Sisters of St. Francis Health Servs., Inc.*, 2011 4399236, at *3 (N.D. Ind. Sept. 21, 2011); *Treat v. Tom Kelley Buick Pontiac GMC, Inc.*, 710 F. Supp. 2d 777, 790–92 (N.D. Ind. 2010); *O'Malley v. J. C. Penney Corp.*, 2009 WL 10695107, at *2 (N.D. Ind. Sept. 24, 2009); *Hill v. Mich. City Area Schs.*, 2009 WL 10691376, at *1–2 (N.D. Ind. Mar. 24, 2009). This discrepancy notwithstanding, application of the *Thorn* prohibition is appropriate in this case, both for purposes of maintaining consistency with this district's prior application of *Thorn* and because the case procedurally progressed to summary judgment in the state court proceedings.

(explaining that a subsequent contradicting affidavit based on newly discovered evidence is permitted).

Here, Mr. Hendricks' errata sheet changes were clearly substantive as they were intended to change the meaning of his testimony—that is, to change the deposition transcript from what he said to what he meant, *see Thorn*, 207 F.3d at 389—because he did not want to attribute physical symptoms to Equifax's conduct despite previously stating otherwise. These changes contradicted what was said originally. While Mr. Hendricks' errata sheet states that "[h]is testimony concerning physical symptoms was responding to a general question concerning whether physical symptoms had been discussed generally," [*see* DE 5-2 at 2–3], the actual deposition transcript shows that the question about physical symptoms was really a part of a broader series of questions directed to what types of harms Plaintiff may have suffered from due to Equifax's reporting, and further, what harms Mr. Hendricks planned to testify to. [DE 5-1 at 38:7–42:3].

Mr. Hendricks' changes cannot plausibly be represented as a correction of a transcription error, such as the dropping of a "not," because they seek to wholly upend the original answer given. *See Thorn*, 207 F.3d at 389. These changes also do not fall under any of the narrow classes of exceptions discussed earlier, such as a clarification of ambiguous or confusing language or a statement based on newly discovered evidence. *See, e.g.*, *Monroe*, 2011 WL 4399236, at *3 (barring errata sheet changes where deponent failed to show any ambiguities or confusion with the line of questioning or their responses); *Hale*, 959 F.3d at 317 (barring subsequent contradictory affidavit where it did not contain newly discovered evidence and failed to acknowledge the known, newly discovered evidence). Although Mr. Hendricks stated they were intended for clarification and to provide context, the questions and responses in the

deposition transcript are unambiguous, straightforward, and directed toward the same subject: the types of harms Mr. Hendricks planned to testify about regarding Equifax's reporting.

Therefore, the Court finds that Equifax's motion to strike should be granted. Mr. Hendricks' errata sheet changes are stricken in their entirety, and the original deposition testimony remains operative. Having addressed that matter, the Court now turns to Plaintiff's motion to remand.

## II. Motion to Remand [DE 7]

Equifax's third removal—much like the previous two removals—is based on the premise that Plaintiff alleged facts demonstrating she suffered concrete injuries sufficient to confer Article III standing. [*See* DE 1 at 5]. Plaintiff argues that she has continuously disavowed such injuries throughout these proceedings and that Equifax has failed to demonstrate otherwise. [DE 8 at 2]. Therefore, the central inquiry here is whether the "injury in fact" prong for Article III standing has been met. To answer that question, the Court must determine whether Plaintiff's injuries are of the "concrete" and "particularized" nature that Article III requires. *See Ewing v. MED-1 Sols., Inc.*, 24 F.4th 1146, 1151 (7th Cir. 2022) (internal quotation marks omitted) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016)) ("To be concrete, an injury must be real, and not abstract, but concrete need not mean tangible."). Because the required showing for standing changes as the litigation progresses, the removing party—in this case, Equifax—would have to "set[] forth by affidavit or other evidence specific facts that, taken as true, support each element of standing." *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 285 (7th Cir. 2020) (alteration and internal quotation marks omitted); *see TransUnion*, 594 U.S. at 431 (quoting *Lujan*, 504 U.S. at 561) (explaining that standing must be demonstrated "with the manner and degree of evidence required at the successive stages of the litigation").

### A. Concrete Injuries Under the FCRA

#### *1. Supreme Court Jurisprudence*

Recently, in *TransUnion v. Ramirez*, the Supreme Court analyzed what makes a harm "concrete" for purposes of Article III standing within the context of FCRA claims. There, the Court explained that "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *TransUnion*, 594 U.S. at 424 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008)). Stated differently, "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* (quoting *Spokeo*, 578 U.S. at 341). In assessing whether a harm is closely related to a traditional basis for a lawsuit, the Court indicated that a harm need not be an exact duplicate of one recognized in American history and tradition, but that this determination is "not an open-ended invitation for federal courts to loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *Id.* at 424–25. To exemplify this point, the Court highlighted that certain harms readily qualify as concrete injuries under Article III, the most obvious of which being traditional tangible harms of a physical or monetary nature. *Id.* at 425. The Court further noted that various intangible harms can be concrete, with reputational harms, disclosure of private information, intrusion upon seclusion, and harms specified by the Constitution itself being prime examples. *Id.* (collecting cases).

The Court also recognized that Congress's decision to impose a statutory prohibition or obligation on a party must be afforded due respect, and that Congress, through the granting of a private right of action, may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Id.* (quoting *Spokeo*, 578 U.S. at 341). But

importantly, although Congress may recognize and elevate existing harms to an actionable legal status, Congress cannot "simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.* at 426 (quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)). In other words, a plaintiff does not automatically satisfy the injury-in-fact prong by mere virtue of having a private right of action or by pointing to a procedural violation of a statute; to satisfy Article III standing, a plaintiff must nonetheless possess "a concrete injury even in the context of a statutory violation." *Id.* (quoting *Spokeo*, 578 U.S. at 341); *see also id.* at 427 (emphasis in original) ("[U]nder Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court.").

With these points in mind, the Court considered the concreteness of the FCRA injuries themselves. In distinguishing between inaccurate information maintained internally and inaccurate information disseminated to third-party creditors—both harms for which Congress granted private rights of action—the Court held that "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm," and therefore is insufficient to establish Article III standing. *Id.* at 434. The Court further rejected the argument that an asserted material risk of future harm can establish a concrete injury for purposes of seeking retrospective relief, holding instead that while a future risk of harm can establish standing to seek injunctive relief due to its forward-looking nature, the "mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm." *Id.* at 436 (emphasis in original). In a footnote appended to that latter point, the Court explained that a "plaintiff's knowledge that he or

she is exposed to a risk of future physical, monetary, or reputational harm could cause its own current emotional or psychological harm," but that the Court would not take a position on whether such an emotional or psychological harm could suffice for purposes of Article III standing. *Id.* at 436 n.7.

#### ***2. Seventh Circuit Jurisprudence***

Following *TransUnion*, the Seventh Circuit has continued to recognize particular FCRA-related harms as sufficiently concrete, while also taking a relatively narrow approach to other such harms.[6] For example, regarding tangible harms, the Seventh Circuit has found that postage paid to send a validation request or credit dispute—that is, the tangible costs of spending time, effort, and money for postage and certified mail fees—is a form of money damage generally determined to be a concrete harm. *See Mack v. Resurgent Cap. Servs., L.P.*, 70 F.4th 395, 405–06 (7th Cir. 2023). For intangible harms, the Court has recognized that altered behavior can amount to a concrete harm in certain circumstances, such as where a statutory violation caused the plaintiff to change their behavior in a way that inflicts the concrete harm on the plaintiff. *Patterson v. Howe,* 96 F.4th 992, 998 (7th Cir. 2024); *see Markakos v. Medicredit, Inc.*, 997 F.3d 778, 780 (7th Cir. 2021) (explaining that for debt collection practices, "an FDCPA violation might cause harm if it . . . alters a plaintiff's response to a debt"); *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020) (holding that a plaintiff might suffer an injury if a misleading debt collection practice "leads her to pay something she does not owe, or to pay a debt with interest running at a low rate when the money could have been used to pay a

[6] Much of the caselaw cited here pertains to claims under the Fair Debt Collection Practices Act (FDCPA) (codified at 15 U.S.C. §§ 1692–1692p), a distinct consumer protection statute from the FCRA. *See Dixon v. Experian Info. Sols., Inc.*, 741 F. Supp. 3d 763, 766 n.2 (N.D. Ill. 2024). Despite this, the standing analysis under the FCRA and FDCPA are largely interchangeable. *Id.; see, e.g.*, *Nabozny v. Optio Sols., LLC*, 84 F.4th 731, 737–38 (7th Cir. 2023) (FDCPA standing case relying extensively on *TransUnion*, a FCRA case).

debt with interest running at a higher rate"); *Lavallee v. Med-1 Sols., LLC*, 932 F.3d 1049, 1053 (7th Cir. 2019) (holding that the plaintiff had standing to pursue her claims against a debt collector for a statutory violation because it was "reasonable to infer that she would have exercised her statutory rights" to dispute and verify the debts). *But see Nettles v. Midland Funding, LLC*, 983 F.3d 896, 900 (7th Cir. 2020) (holding that hiring an attorney to seek guidance or to file a lawsuit, even if as a response to a debt collection practice, is not a concrete harm); *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 939 (7th Cir. 2022) (same).

In contrast, the Seventh Circuit has repeatedly held that psychological states and emotional distress alone are not concrete injuries. *See Patterson*, 96 F.4th at 1000; *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F. 4th 665, 668 (7th Cir. 2021) (collecting cases) (finding that anxiety, embarrassment, stress, annoyance, intimidation, infuriation, disgust, indignation, and confusion are not concrete injuries that confer Article III standing). Yet despite this, the Seventh Circuit has hinted that the buck does not stop there, as additional harms, such as those stemming from a psychological state, may suffice. For example, in *Pennell v. Global Trust Management, LLC*, the court explained that "stress by itself with *no physical manifestations* and no qualified medical diagnosis" does not amount to a concrete injury. 990 F.3d 1041, 1045 (7th Cir. 2021) (emphasis added); *see also United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 616 (7th Cir. 2015) (noting that "purely psychological harm" does not suffice to establish Article III standing); *Freeman v. Ocwen Loan Servicing, LLC*, 113 F.4th 701, 710–11 (7th Cir. 2024) (affirming the district court's dismissal of claims for lack of standing where plaintiff failed to point to physical manifestations of stress or related medical diagnoses). Trial courts within this circuit have similarly found standing where allegations or proof of physical manifestations of distress are made. *See, e.g.*, *Gilbert*, 608 F. Supp. 3d at 664 (finding

that plaintiff had standing when debt collection activity made her "so angry she began shaking"); *Mladenov*, 2022 WL 5116450, at *3 (finding standing where the plaintiff "suffered from lack of sleep, loss of appetite, and an inability to focus while working"); *Billups*, 2022 WL 3684572, at *5 (finding standing where the plaintiff made "allegations of headaches and loss of sleep").[7]

**B. Equifax's Grounds for Removal**

Having addressed the law on concrete injuries for a FCRA claim, the Court now turns to Equifax's proffered grounds for removal. Here, Equifax contends that Plaintiff sufficiently demonstrated standing through two avenues: (1) her supplemental briefing on standing in state court and (2) her expert's deposition testimony on damages. [DE 1 at 3–4]. And as stated previously, Plaintiff asserts that she is not seeking anything beyond damages for emotional distress. [DE 8 at 10]. Moreover, Plaintiff argues that these facts were known to Equifax for years, were in its possession, and cannot now make removability ascertainable. [*Id.*]. The Court will therefore address both categories of facts, and whether they make removal ascertainable, in tow.

***1. Plaintiff's Supplemental State Court Brief on Standing***

Starting with Plaintiff's supplemental brief on standing, Equifax contends that Plaintiff took a contrary position to that in the previous proceedings by relying on damages for a litany of both tangible and intangible harms to support standing in state court. Besides the obvious request for emotional distress, Plaintiff's brief highlighted various harms which occurred because of Equifax's conduct, including embarrassment, repeated disputes, telephone disputes, family and relationship impacts, unfavorable housing arrangements, reputational harm, and Plaintiff's desire

[7] The Seventh Circuit reiterated in *Choice v. Kohn Law Firm, S.C.* that "loss of sleep is . . . insufficient to show a concrete harm." 77 F.4th 636, 640 (7th Cir. 2023). Regardless, each of the trial court decisions listed above would still possess firm support for standing given the other physical symptoms at play, such as lack of appetite, headaches, and visible shaking.

to avoid filing suit. [*See* DE 8 at 10; DE 1-3 at 3–5, 8–11, 16]. Specifically, Equifax targets Plaintiff's assertions of tangible harms, such as repeated time, effort, and money spent to correct inaccurate reporting, as the basis for which it once more seeks removal. [DE 1 at 4; DE 10 at 2–3]. In her brief, Plaintiff made the following statement acknowledging Article III standing as it relates to concrete injuries and her suffering of those precise harms:

> Federal courts likewise recognize that repeated efforts to correct inaccurate reporting—including postage costs, time expenditure, and repeated disputes—constitute concrete injury. In *Mack v. Resurgent Capital Services, L.P.*, the Seventh Circuit held that a consumer suffered concrete injury where confusing debt communications caused her to send a *second* validation request, expend *additional* time and effort, and incur more postage costs. 70 F.4th 395, 401-02 (7th Cir. 2023). The Seventh Circuit specifically recognized that "the time and effort [the consumer] spent reasserting her statutory right" and "money she spent" responding to the reporting constituted concrete injury sufficient for Article III standing. *Id.* at 404. ***Here, [Plaintiff] likewise repeatedly expended time, effort, and money after ger first dispute in attempting to correct Equifax's continued post-judgment reporting despite repeatedly providing documentation establishing she owed nothing. Had Equifax corrected its reporting the first time around, [Plaintiff] would not have had to expend additional time, effort, or resources.***

[DE 1-3 at 13–14 (original alteration and internal record citations omitted; upper italics in original, lower bold and italics added)]. Based on these statements, Equifax argues that Plaintiff "expressly stated that specifically as to her post-judgment disputes, she had standing under both Indiana law and federal law because of her expenditure of money, time, and her effort in disputing." [DE 10 at 8].

Plaintiff does not appear to dispute the context of these statements, nor does she contest that these alleged tangible harms would ordinarily be deemed concrete. Rather, she argues that these facts were known to Equifax long before May 27, 2026, when it removed the case for a third time. [DE 8 at 10]. In particular, Plaintiff asserts that Equifax possessed her written credit disputes, processed them, produced them in discovery, and proceeded to use them in both the summary judgment and prior removal briefing. [*Id.* at 11]. Further, Equifax possessed the

telephone dispute recordings and transcripts detailing that Plaintiff mailed documents, attempted to remedy the situation prior to filing suit, and went to court to obtain the necessary orders and documents to support her credit disputes. [*Id.*].

Although Equifax does not lean on the other asserted harms as a primary ground for the current removal, Plaintiff further argues that those harms and the associated facts were known to Equifax in much the same way as the facts related to the alleged tangible harms. [*Id.* at 10, 11–13]. Specifically, Plaintiff contends that Equifax knew of the "emotional-harm theory" since Plaintiff's amended complaint was filed in Cause No. 4:23-cv-66, where Plaintiff expressly alleged that Equifax's conduct and omissions, including the failure to conduct a reasonable investigation, caused Plaintiff stress. [*Id.* at 10]. Plaintiff states that she has maintained this theory throughout her prior remand briefing, and further expressly stated on the record during the second remand hearing that she sought only damages for emotional distress. [*Id.*; *see also* Cause No. 4:25-cv-8, DE 35 at 4].

Likewise, Plaintiff notes that Equifax previously attempted removal based on the allegations of reputational harm, disruptions to familial relationships, unfavorable housing arrangements, and embarrassment. Notwithstanding that some of these harms are either insufficient alone to establish standing (*e.g.,* embarrassment) or are potentially untraceable to Equifax's conduct (*e.g.,* housing arrangements), Plaintiff contends these theories were already hashed out in the previous remand briefing, were rejected by the Court—initially and on reconsideration—and were similarly known long before May 2026. [*Id.* at 12; *see also* Cause No. 4:25-cv-8, DE 28 at 11 (arguing lack of traceability for harms related to housing and traveling to see fiancé)].

As recently explained by the Supreme Court in *Enbridge Energy, L.P. v. ex rel. Nessel*:

> The federal civil removal statutes have an obvious concern with efficiency, and a general interest in avoiding prolonged litigation on threshold [non-merits] questions. That is reflected not only in the short deadline for removal itself, but also in the strict 30-day deadline for seeking remand of a removed action, and a default rule that remand orders are not appealable[.]

146 S. Ct. 1074, 1084 (2026) (internal citations and quotations marks omitted); *see also Walker v. Trailer Transit, Inc.*, 727 F.3d 819, 823 (7th Cir. 2013) (quoting *Wilson v. Intercollegiate (Big Ten) Conference Athletic Ass'n*, 668 F.2d 962, 965 (7th Cir. 1982)) ("The purpose of the 30-day limitation is twofold: to deprive the defendant of the undeserved tactical advantage that he would have if he could wait and see how he was faring in state court before deciding whether to remove the case to another court system; and to prevent the delay and waste of resources involved in starting a case over in a second court after significant proceedings, extending over months or even years, may have taken place in the first court."). Accordingly, 28 U.S.C. § 1446 thus makes clear the timeframe for which removal can be made. For a case initially filed in state court, a notice of removal "shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based[.]" 28 U.S.C. § 1446(b)(1). But where the case is not initially removable, "a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may **first be ascertained** that the case is one which is or has become removable." *Id.* § 1446(b)(3) (emphasis added).

In distinguishing these timeframes, the Seventh Circuit recognizes that "[t]he moment a case becomes **removable** and the moment the 30-day removal clock **begins to run** are not two sides of the same coin." *Walker*, 727 F.3d at 824 (emphases added) (internal quotation marks omitted). The court has thus held that "[t]he 30-day removal clock does not begin to run until the

defendant receives a pleading or other paper that affirmatively and unambiguously reveals that the predicates for removal are present." *Id.* In assessing whether facts are those "from which [removal] may first be ascertained" as required by § 1446(b)(3), the question the Court must determine is "whether *that document*, on its face or in combination with earlier-filed pleadings, provides specific and unambiguous notice that the case satisfies federal jurisdictional requirements and therefore is removable." *Id.* at 825 (emphasis in original). Importantly, "[a]ssessing the timeliness of removal should not involve a fact-intensive inquiry about what the defendant subjectively knew or should have discovered through independent investigation." *Id.* Rather, as the statute plainly states, the clock will only trigger when facts satisfying the Court's jurisdictional requirements are *actually* received by the defendant or filed with the state court during the course of litigation. *Id.*

Here, the Court must answer two questions: (1) whether the facts Equifax based the removal on satisfy subject-matter jurisdiction requirements, and (2) whether they were ascertainable at the time Equifax filed the current removal. Answering the first question, Plaintiff's tangible harms—specifically those for exhaustion of time, resources, and effort—clearly meet the threshold for standing. *See Mack*, 70 F.4th at 405–06. Similarly, Plaintiff's allegation of an intangible harm for reputational injury would also likely pass as concrete. *See TransUnion*, 594 U.S. at 425. But Plaintiff's other harms, such as stress, embarrassment, and behavioral changes are, without more, non-concrete injuries. *See Wadsworth*, 12 F. 4th at 668. Further, Plaintiff's unfavorable housing arrangements and need to travel to see her fiancé appear untraceable to Equifax's conduct, particularly given the omission of any express or implicit allegations stating otherwise. *See TransUnion*, 594 U.S. at 423 (requiring that the injury was likely caused by the defendant). Plaintiff also does not allege that any altered behavior itself

caused a concrete harm. *See Patterson,* 96 F.4th at 998. This therefore leaves only Plaintiff's tangible harms and the possibility of reputational harm as permissible grounds to ascertain removal.

But looking at the second question, and even assuming that some of the other harms could have satisfied the concreteness analysis, the figurative deathblow to *each* of these theories is that Equifax had these facts in its possession *and* argued them previously in the prior remand briefing. Importantly, the mere fact that Equifax sought removal before is not what makes its current ground for removal untimely. The Seventh Circuit has explained that "[r]emoval is not a one-shot proposition," and that "[a] defendant may remove even a previously remanded case if subsequent pleadings or litigation events reveal a **new basis for removal**." *Railey v. Sunset Food Mart, Inc.*, 16 F.4th 234, 238 (7th Cir. 2021) (emphasis added). Rather, it is because Equifax previously relied upon these very same facts when arguing against the second remand. Plaintiff highlighted these points thoroughly in her reply brief to the second remand, and has further pointed out the same in her briefing for the current remand. [*See* DE 8; DE 11; *see also* Cause No. 4:25-cv-8, DE 28 (noting extensively the time, effort, and postage costs associated with Plaintiff's disputes with Equifax)]. Therefore, even though separate removal attempts may be governed by separate removal clocks, *see Railey*, 16 F.4th at 239, the determination of *when* a particular fact made removability ascertainable remains the same throughout. And because the facts asserted in Plaintiff's supplemental standing brief were ascertainable at least as far back as the second remand proceedings in Cause No. 4:25-cv-8, Equifax's present removal on those grounds is ultimately untimely.

### *2. Hendricks Deposition*

Moving on to Equifax's second basis for removal, Equifax contends that Plaintiff's expert, Evan Hendricks, testified to physical manifestations of Plaintiff's emotional distress, thereby rendering it a concrete harm under the FCRA. [DE 10 at 8]. Specifically, Equifax relies on Mr. Hendricks testimony that Plaintiff "would feel it in her chest and that her hands would shake when these things came up, the problem of not getting something fixed when she expected to get it corrected." [DE 5-1 at 41:23–42:1]. *See Gilbert*, 608 F. Supp. 3d at 664 (explaining that physical manifestations of emotional distress like shaking can convert an otherwise non-concrete injury into a concrete one, regardless of the magnitude of the injury). But Plaintiff, as with the supplemental brief, similarly asserts that this does not make removal timely, nor does she believe that this basis for removal is traceable to Equifax. [DE 8 at 13, 20].

Starting with the timeliness argument, the issue of whether Plaintiff physically manifested her emotional distress was not discussed in the prior rounds of removal and remand. Rather, in contrast to the damages theories discussed under Plaintiff's supplemental brief, the facts pertaining to physical manifestations first became ascertainable during Mr. Hendricks' deposition, which occurred on May 21, 2026. And because Equifax removed this case six days later, Equifax was well within the thirty-day window for doing so, rendering the removal timely. *See* § 1446(b)(3).

Second, as to the traceability issue, the purpose of Mr. Hendricks' testimony was to provide expert opinions on credit reporting and the harms associated with credit disputes, including damages related to Plaintiff's dispute with Equifax. [DE 5-1 at 8:15–21, 35:20–36:19]. As part of a series of questions regarding what harms Mr. Hendricks planned to testify that Plaintiff had suffered as a result of the credit reporting *in this case*, either through expert opinion

or Plaintiff's communications, Mr. Hendricks stated that he was told on May 20, 2026, that Plaintiff was suffering from physical symptoms related to her emotional distress. Plaintiff argues this testimony does not attribute any physical symptoms to Equifax's conduct, both because it is an isolated statement and because Mr. Hendricks is not proffering an expert causation opinion. [DE 8 at 20]. But again, the question and response as to physical symptoms was not isolated; it was part of a broader discussion about what harms—tangible and intangible—Mr. Hendricks planned to testify to, both in his expert opinion and in corroboration with what Plaintiff would likely testify to at trial. And while Plaintiff is correct that Mr. Hendricks cannot establish physical symptoms himself through an expert causation opinion, which Mr. Hendricks agreed with on the record when asked about emotional distress, this is irrelevant. Mr. Hendricks was asked to opine about harms associated with the credit reporting industry, and how they relate to *the specific facts of this credit dispute*.

Accordingly, Equifax has demonstrated that removability is ascertainable through Mr. Hendricks' testimony on physical manifestations of emotional distress.

## CONCLUSION

For these reasons, the Court **GRANTS** Equifax's Motion to Strike Errata Sheet [DE 5] and **DENIES** Plaintiff's Motion to Remand [DE 7].

SO ORDERED.

ENTERED: September 24, 2026

/s/ GRETCHEN S. LUND
Judge
United States District Court